AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No.    1:21-MJ-196 |
| 2723 BAKER AVENUE, APT 28 | ) |
| CINCINNATI, OH 45211 | ) |
| | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

    I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1 (incorporated by reference).

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 1951(a) | Hobbs Act Robbery |

The application is based on these facts:

See Attached Affidavit (incorporated by reference).

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of \_\_\_\_\_ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

DEREK GRAHAM    Digitally signed by DEREK GRAHAM
Date: 2021.03.07 19:42:08 -05(

*Applicant's signature*

Derek Graham, ATF Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ FaceTime Video Conference _____ *(specify reliable electronic means)*.

Date:    **Mar 7, 2021**

*Stephanie K. Bowman*

*Judge's signature*

City and state:    Cincinnati, Ohio

Hon. Stephanie K. Bowman, U.S. Magistrate Judge

*Printed name and title*

## ATTACHMENT A-1

*Property to be searched*

The property to be searched is 2723 Baker Avenue, Apt 28, Cincinnati, OH 45211 (THE PREMISES), further described as an apartment within 2723 Baker Avenue. The apartment is on the second floor. The number "28" appears on the door to the apartment.





**ATTACHMENT B**

*Property to be seized*

1.      All records relating to violations of 18 U.S.C. § 1951(a) (Hobbs Act Robbery), those violations involving LAMOND JOHNSON and occurring on or about February 8 and 9, 2021 (the Target Offenses), including:

      a.   All firearms or ammunition;

      b.   All black sweatpants;

      c.   All black hooded sweatshirts;

      d.   All black gloves and white gloves;

      e.   All black shoes;

      f.   All red face masks and bandanas;

      g.   U.S. currency;

      h.   All communications and records, in whatever form they may be—whether they are paper communications such as letters, audio recordings, electronic communications, or otherwise:

            i.   Relating to robberies of convenience stores, Madeira Beverage, and/or gas stations, including plans and preparations to commit those robberies;

            ii.   Relating to the shooting of R.G. at Madeira Beverage;

    iii.  Relating to the possession of a firearm or ammunition by LAMOND JOHNSON;

    iv.  Relating to communications between LAMOND JOHNSON and any coconspirators to the crimes under investigation;

    v.  Relating to vehicles, including rental vehicles, used by JOHNSON and/or coconspirators in connection with the robberies;

2.    All cell phones, smart phones, tablets, and computers that could contain electronic records relating to the Target Offenses;

3.    For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence

2

of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.   records of or information about Internet Protocol addresses used by the COMPUTER;

l.   records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.   contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: (1) 2723 BAKER AVENUE, APT 28, CINCINNATI, OH 45211; AND (2) THE DARK BLUE CHEVROLET EQUINOX WITH NO LICENSE PLATE CURRENTLY IN LAW ENFORCEMENT CUSTODY | 1:21-MJ-196<br><br>Case No. _____ |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Derek Graham, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the premises known as 2723 Baker Avenue,

Apt 28, Cincinnati, OH 45211 (the **TARGET PREMISES**), further described in Attachment

A-1, and the Chevrolet Equinox with no license plate that is currently in law enforcement

custody (the **TARGET VEHICLE**), further described in Attachment A-2, for the things

described in Attachment B.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms &

Explosives (ATF), and have been so employed since October of 2007.  As a part of my training

with the ATF, I graduated from the Federal Law Enforcement Training Center, Criminal

Investigator School, located in Brunswick, Georgia.  I graduated from the ATF Special Agent

Basic Training Academy, located in Brunswick, Georgia, in April 2008.  Prior to my

employment with ATF, I was a Federal Air Marshal in the Department of Homeland Security from June 2006 through October 2007.  In addition, I was a Criminal Research Specialist with the Washington, DC High Intensity Drug Trafficking Area/Drug Enforcement Administration from June 2003 through June 2006.  I am a graduate of Augustana College, where I received a Bachelor's degree in Business Administration in May of 2002.  I am also a graduate of Boston University, where I received a master's degree in Criminal Justice in June of 2006.

3.      I have experience in the investigation, apprehension, and prosecution of individuals suspected of being involved in federal firearms and drug offenses.  I have specific experience in investigating the use of cell phones by criminal suspects who are involved in the commission of those offenses.  I also have knowledge of the technology used by law enforcement authorities to identify cell phones' users and geographic locations.  I have applied for, obtained, and analyzed, or assisted other federal Special Agents and local police officers with applying for, obtaining, and analyzing, more than 360 sets of historical call detail records. In addition, I have mapped in excess of 200 sets of historical records related to telephone cell site information, ping order locations, and/or GPS records.  I have been trained by ATF as a Digital Media Collection Specialist (DMCS), and have completed more than 285 forensic extractions of cellular telephones, computers, and other electronic storage media.  I have also reviewed forensic extractions of cellular telephones, computers, and other electronic storage media, and have examined content and communications contained within these devices obtained by forensic

2

extraction. This content includes records of communication through call logs, text message content, images and videos, and communication made through various social media applications.

4. I know from training and experience that individuals typically keep cell phones on their persons or within their immediate control, such as in the cupholder of a car they are driving, because cell phones are regularly used and possessed as an item of personal property. I also know from my training and experience that in today's age it is typical for individuals engaged in criminal activity to possess multiple active cellular phones at one time. For example, many criminals have one phone that they use for personal communications (e.g., with family members) and another phone that they use to communicate with criminal associates. Similarly, I know that drug dealers commonly have one phone they use with their customers and another they use with their suppliers so that, if one phone is wiretapped, law enforcement will not be able to identify the entire supply chain.

5. In my training and experience, criminals who carry firearms and ammunition tend to keep those firearms and ammunition on their person or in a location over which they have control, such as in their vehicles or residences.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3

7.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1951(a) (Hobbs Act Robbery) have been committed by LAMOND JOHNSON. There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

## PROBABLE CAUSE

**A.      Introduction**

8.      Over the course of two days, from February 8 to 9, 2021, five gas stations or convenience stores in Hamilton, Mason, Madeira, Blue Ash, and Lebanon, Ohio (all within the Southern District of Ohio) were robbed.  In one of the robberies, the suspect shot the owner of the gas station, who later died from his injuries.

9.      As I explain in more detail below, based on the investigation to date, I believe that the same suspect, LAMOND JOHNSON, is responsible for each of the robberies and that he had a coconspirator who drove the get-away car and may have entered at least one of the stores.

10.      I am seeking this warrant for a vehicle used by JOHNSON (the **TARGET VEHICLE**) and a location associated with him (the **PREMISES**).

**B.      On February 8, 2021, at around 7:48 pm, a Shell gas station in Mason was robbed by a suspect carrying a firearm.**

11.      On February 8, 2021, at approximately 7:48 pm, the Warren County Sheriff's Office received a report of a robbery at the Shell Gas Station at 9791 Mason Montgomery Road

4

in Mason, OH.  Shell Gas Station is engaged in the sale of alcohol and/or other items that, based on my training and experience, I know have affected interstate commerce.

12.    Surveillance video from that evening, which includes audio, shows that two Shell Gas Station employees, Victim 1 and Victim 2, were working behind the counter in the area of the cash registers when a suspect who appears to be a Black male entered the gas station.  The suspect was wearing a black hooded sweatshirt that read "Nike" in white lettering, with a white Nike "swoosh" logo.  The sweatshirt's hood was over his head.  The suspect was also wearing black pants with a white logo on the left pant leg, black gloves, black shoes with a small bit of white on the top, and a red face mask or bandana with white accents, as shown in the screenshot below.



13.     After entering, the unidentified suspect walked around the counter to the employee area, where Victim 1 and Victim 2 were standing.  The unidentified suspect then demanded that Victim 1 and Victim 2 open the cash register and place the currency from the cash registers in a bag.  Victim 1 and Victim 2 each opened their respective cash registers and placed the currency from their cash registers into separate plastic bags.  The unidentified suspect then took the bags and left.  As the suspect left, Victim 1 and Victim 2 raised their hands in a gesture that, based on my training and experience, I believe they intended to mean "Do not shoot."

14.     Surveillance video shows that, after leaving the gas station, the unidentified suspect ran west.

15.     Surveillance video from a nearby BP gas station, which is located south of the Shell station, shows that, at approximately the same time as the robbery, a person ran from the Shell station over to Monro Auto Service, which is west of the Shell station, and got into a large, white SUV as a passenger. The SUV drove away. Based on this video, I believe that the suspect had a coconspirator who was driving the getaway vehicle.

16.     In an interview, Victim 1 and Victim 2 both said that they had seen a firearm.

17.     The screenshot below shows a map of 9791 Mason Montgomery Road, Monro Auto Service, the BP station, and surrounding areas:

6



    **C.**     **Less than an hour later, a Shell gas station in Hamilton was robbed by an armed suspect matching the same description.**

18.     Less than an hour later, at approximately 8:34 pm on February 8, the Hamilton Police Department received a report of a robbery at the Shell Gas Station at 2693 Dixie Highway in Hamilton, OH. This Shell gas station is approximately 17 miles from the Shell station described in the preceding section; a search for directions on Google Maps shows that driving from one to the other would take approximately 28 to 35 minutes, depending on the route.

19.     Shell Gas Station is engaged in the sale of alcohol and/or other items that, based on my training and experience, I know have affected interstate commerce.

20.     Surveillance video from that evening shows a suspect matching the description of the suspect in the earlier robbery entering the gas station. Specifically, the surveillance video shows an individual who appears to be a Black male and who appears to be wearing the same outfit as the suspect from the Mason incident: a black hooded sweatshirt reading "Nike" and with the "swoosh" logo (and with the hood up), black gloves, black shoes with a tiny bit of white on top, and a red face mask or bandana with white accents pulled across his face.  The suspect appears to be holding a firearm in his right hand, as shown below:



21.     Surveillance video shows that the unidentified suspect walked behind the counter, while holding the suspected firearm in his right hand, to where a Shell Gas Station employee (Victim 3) was standing.  The unidentified suspect then directed Victim 3 to put the currency

from the cash register into a bag. Victim 3 complied, and the unidentified suspect then took the bag and left.

22.     The screenshot below shows a map of the relevant Shell gas station in Hamilton and surrounding areas:



**D.     The next day, at approximately 7:39 pm, Victim 3 was shot and killed during an attempted robbery at Madeira Beverage.**

23.     The next day, on February 9, 2021, at approximately 7:39 pm, Madeira Police Department received a report of an attempted robbery in which a person had been shot. The attempted robbery occurred at Madeira Beverage, a convenience store, located at 6005 Kenwood

9

Road, Madeira, OH. Madeira Beverage is engaged in the sale of alcohol and/or other items that, based on my training and experience, I know have affected interstate commerce.

24. The shooting victim (Victim 4) was the owner of Madeira Beverage and had been working in Madeira Beverage that evening. Victim 4 succumbed to his gunshot-related injuries later that same night.

25. That same night, MPD Officers and participating officers located an expended .25 caliber cartridge casing suspected to be ejected from the firearm during the shooting of Victim 4.

26. Surveillance video from that evening shows that an unidentified suspect, who appears to be a Black male, entered the store wearing a black hooded sweatshirt. The sweatshirt had an unidentifiable white logo or text in the upper left chest area. The suspect was also wearing a red face mask or bandana on his face.

10



27.　　The unidentified suspect entered the store and appeared to look down multiple aisles as he walked through the store.  The unidentified suspect then confronted Victim 4, at which time Victim 4 and the unidentified suspect appeared to push and wrestle with each other for approximately four seconds.  Victim 4 then raised his hands as the unidentified suspect displayed and pointed a firearm at Victim 4, as shown in the image below:

11



28.    Surveillance footage shows that Victim 4 then appeared to wave the unidentified suspect away.  Victim 4 then stepped backwards and turned while holding his abdomen.  The unidentified suspect then exited Madeira Beverage.

29.    External surveillance cameras show the unidentified suspect running from the building in a southern direction.

30.    The screenshot below is a map of 6005 Kenwood Road, where Madeira Beverage is located, and surrounding areas.



**E.** **Less than 15 minutes later, a Sunoco gas station in Blue Ash was robbed at gunpoint.**

31. Less than 15 minutes later, at approximately 7:50 pm on February 9, Blue Ash Police Department received a report of a robbery at the Sunoco Gas Station at 10410 Kenwood Road in Blue Ash, OH. This Sonoco is approximately five miles from Madeira Beverage, both of which are on Kenwood Road.

32. Sunoco Gas Station is engaged in the sale of alcohol and/or other items that, based on my training and experience, I know have affected interstate commerce.

13



33.     Surveillance video of this incident is not currently available for review.

34.     I have reviewed a statement written out by a law enforcement officer who interviewed an employee working at the Sonoco gas station that night (Victim 5). The statement indicates that the police officer "wrote out [the] statement" for Victim 5 "due to language barrier." Victim 5 said that the suspect was a Black man wearing a red jacket and a black face mask. Victim 5 said that he/she "saw a small black gun." Victim 5 said that the suspect aimed the firearm at Victim 5 and said "open the register & take a plastic bag & put in the money." Victim 5 said that he/she and the suspect then put money in the bag and that the suspect then took the bag and ran out towards Kenwood, around the building.

14

35.     Although Victim 5's description of the unidentified suspect differs from the description of the suspect observed in surveillance video described above, I believe that the same suspect, and/or his coconspirator, was likely involved in this robbery due to the geographic and temporal proximity to the other robberies described in this affidavit.

36.     As I described above, surveillance video relating to the incident at the Shell station in Mason suggests that, after the robbery, the suspect got into a white SUV as the passenger. Similarly, as I describe below, a witness to the fifth robbery, in Lebanon, saw the suspect run from the store and get into a vehicle as a passenger.  Based on these facts, I believe that the robber was not acting alone.

F.     **About 90 minutes later, a suspect in a black hoodie and a red mask attempted to rob a Marathon gas station in Lebanon at gunpoint.**

37.     Later the same night, at approximately 9:19 pm, Lebanon Police Department (LPD) received a report of an attempted robbery at the Marathon Gas Station located at 660 North Broadway Street, Lebanon, OH.  This Marathon is approximately 18 miles away from the Sonoco described in the preceding section; a search on Google Maps suggests that a direct trip between the two would take approximately 25 minutes.

38.     Marathon Gas Station is engaged in the sale of alcohol and/or other items that, based on my training and experience, I know have affected interstate commerce.

39.     Based on reports I have reviewed, I understand that the surveillance cameras in the Marathon gas station were not operational at the time of the incident.

15

40.     An employee of the Marathon Gas Station, Victim 6, said that a Black male entered the store wearing a black sweatshirt and with a red mask on his face with white accents on the fabric.

41.     Victim 6 said the unidentified suspect entered the store, removed a soda pop from the cooler, and approached the counter.  Victim 6 stated he/she told the suspect how much the soda pop cost, at which the time suspect pointed a firearm at Victim 6 and staid, "Give me what you got."  Victim 6 said he/she did not comply with the suspect's demand and instead leaned down and grabbed under the counter, pretending he/she had a firearm.  Victim 6 said the unidentified subject then ran from the Marathon Gas Station.

42.     Victim 6 said he/she saw what he/she believed to be a black or dark-blue Chevy Equinox, with its headlights off, pick up the unidentified subject and travel south on North Broadway.  Victim 6 described the driver as a Black male wearing a mask of an unknown color.

43.     Victim 6 said he/she attempted to follow the vehicle as it drove south on North Broadway.  In addition, traffic cameras in the city of Lebanon captured a suspected Chevrolet Equinox driving with its headlights off as it continued south on North Broadway and then turned left on Main Street, driving east.

44.     The screenshot below is a map of the location of the Marathon gas station and surrounding areas:

16



**G.    Based on the investigation to date, I believe that the same two suspects likely committed all five of the robberies described above.**

45.    Because of the geographic and temporal proximity of all five of the robberies; because surveillance video shows a similar suspect in a black hooded sweatshirt and with a red face covering in the first, second, third, and fifth robbery; and because surveillance video or Victim statements from some of the robberies suggest that the unidentified suspect entered a getaway vehicle as a passenger, I believe that the same unidentified suspect and a coconspirator are involved in all of the robberies described above.

17

**H.      Information from Google suggests that an electronic device associated with LAMOND JOHNSON was present at at least four of the robberies.**

46.      Based on my training and experience, as well as open-source materials published by Google LLC ("Google"), I know that Google offers accountholders a service called "Location History," which authorizes Google, when certain prerequisites are satisfied, to collect and retain a record of the locations where Google calculated a device to be based on information transmitted to Google by the device. That Location History is stored on Google servers, and it is associated with the Google account that is associated with the device. Each accountholder may view their Location History and may delete all or part of it at any time.

47.      Based on my training and experience, I know that the location information collected by Google and stored within an account's Location History is derived from sources including GPS data and information about the wi-fi access points and Bluetooth beacons within range of the device.  Google uses this information to calculate the device's estimated latitude and longitude, which varies in its accuracy depending on the source of the data.  Google records the margin of error for its calculation as to the location of a device as a meter radius, referred to by Google as a "maps display radius," for each latitude and longitude point.

48.      On February 12, 2021, the Honorable Judge Litkovitz, U.S. Magistrate Judge for the Southern District of Ohio, issued Search Warrant No. 1:21-MJ-0158, directing Google to provide information and records relating to any Google accounts that were present in at

18

particular locations and particular times associated with the robberies described above, specifically:

Incident 1: Shell Gas Station - 9791 Mason-Montgomery Road, Mason, OH

- Date: February 8, 2021
- Time Period: 7:40pm – 7:55pm EST (Eastern Standard Time), UTC -5 Hours
- Target Location:  Area contained within below listed points
  1. Point A: 39.296221, -84.317776
  2. Point B: 39.296090, -84.315510
  3. Point C: 39.295320, -84.315633
  4. Point D: 39.295428, -84.317975



Incident 2: Shell Gas Station - 2693 Dixie Highway, Hamilton, OH

- Date: February 8, 2021
- Time Period:  8:25pm – 8:40pm EST (Eastern Standard Time) UTC -5 Hours
- Target Location:   Geographical area contained within the below listed points
  o    Point A: 39.369753, -84.548786
  o    Point B: 39.369605, -84.547314
  o    Point C: 39.368719, -84.546825

19

      o      Point D: 39.368824, -84.548856



<u>Incident 3: Madeira Beverage - 6005 Kenwood Road, Madeira, OH</u>

- Date: February 9, 2021
- Time Period:  7:30pm – 7:45pm EST (Eastern Standard Time) UTC -5 Hours
- Target Location:   Geographical area contained within the below listed points
    - Point A:  39.175858, -84.384784
    - Point B:  39.176247, -84.383480
    - Point C:  39.175407, -84.383912
    - Point D:  39.175346, -84.385028



Incident 4: Sunoco Gas Station – 10410 Kenwood Road, Blue Ash, OH

- Date: February 9, 2021
- Time Period:  7:45pm – 8:00pm EST (Eastern Standard Time) UTC -5 Hours
- Target Location:   Geographical area contained within the below listed points
  - Point A:  39.251869, -84.375335
  - Point B:  39.250308, -84.372321
  - Point C:  39.249677, -84.372466
  - Point D:  39.249163, -84.375551



Incident 5: Marathon Gas Station – 660 North Broadway Street, Lebanon, OH

- Date: February 9, 2021
- Time Period:  9:10pm – 9:25pm EST (Eastern Standard Time) UTC -5 Hours
- Target Location:   Geographical area contained within the below listed points
  - Point A:  39.445865, -84.206635
  - Point B:  39.445717, -84.203383
  - Point C:  39.442454, -84.204506
  - Point D:  39.442628, -84.207484



49.     On March 1, 2021, Google provided Anonymized Device Identification (ID)

information for Google accounts present at the described locations and time ranges. I conducted

an analysis of the Anonymized Device ID information and identified three Anonymized Device

IDs—ID numbers -967784745, 469003545, 290681031—that, according to Google's data, were

present at all of the following locations during the time periods listed above:

- February 8, 2021 – Shell Gas 9791 Mason-Montgomery Rd., Mason, OH

- February 8, 2021 – Shell Gas 2693 Dixie Hwy, Hamilton, OH

- February 9, 2021 – Sunoco Gas 10410 Kenwood Rd., Blue Ash, OH

- February 9, 2021 – Marathon Gas 660 N. Broadway St., Lebanon, OH

50.     I requested that Google provide identifying information for those three IDs, and on March 5, 2021, Google provided information showing that the Anonymized Device IDs are associated with the following Google Account IDs:

- Anonymized Device ID -96778475  = Google Account ID 369781974448

- Anonymized Device ID 469003548 = Google Account ID 583241281066

- Anonymized Device ID 290681031 = Google Account ID 849998195587

51.     The records from Google showed that Google Account ID 369781974448 is associated with the following subscriber:

a.   Name: LAMOND JOHNSON

b.   Email: johnsonlamond33@gmail.com

c.   Recovery Email: johnsonlamond3@gmail.com

d.   Recovery SMS: 513-280-1364

52.     Google Account ID 583241281066 is associated with the following subscriber:

a.   Name: Salvatore Ferragamo

b.   Email: johnsonlamond3@gmail.com

c.   Recovery Email: johnsonlamond33@gmail.com

d.   Recovery SMS: 513-280-1364

53.     Google Account ID 849998195587 is associated with the following subscriber:

23

    a.  Name: LAMOND JOHNSON

    b.  Email: johnsonlamond86@gmail.com

    c.  Recovery Email: None Listed

54.    Because all three of these accounts are associated with the name "Lamond Johnson" either in the subscriber name or in the email address (all three of which are variations on "johnsonlamond"), I believe that all three of these accounts are used by the same person. Moreover, because 513-280-1364 is the "Recovery SMS" phone number for two of the three accounts, I believe the user of these accounts likely uses the phone number 513-280-1364. Based on my training and experience, I know that a "Recovery SMS" phone number is the phone number to which Google sends a text message if the user forgets the password to his or her account.

55.    On March 5, 2021, I queried telephone number 513-280-1364 through a database accessible by law enforcement that I have determined in the past to be accurate and credible. Based on this query, I identified telephone number 513-280-1364 to be associated with LAMOND JOHNSON (which is consistent with the subscriber names and email addresses described above).

**I.    LAMOND JOHNSON is a convicted felon with connections to Cincinnati.**

56.    In 2006, LAMOND JOHNSON was convicted of Kidnapping, Rape, and Aggravated Robbery in Lucas County, Ohio. He was sentenced to 14 years' imprisonment for those offenses and is currently on parole.

24

57.     JOHNSON's parole officer reported that JOHNSON's supervision was transferred to Las Vegas, Nevada, in approximately May 2020; however, JOHNSON never reported to parole in Las Vegas.

58.     I queried a database for addresses associated with JOHNSON. I found that as of 2018, he was associated with the address ████████████, Liberty Township, Ohio. As of December 2019, he was associated with an address in Cincinnati, Ohio: ████████████ ██ Cincinnati, Ohio. As of February 2020, he was associated with ████████████ in Cincinnati, Ohio.

**J.     On March 7, 2021, location data for 513-280-1364 put the phone near the PREMISES, and an agent saw JOHNSON come in and out of the apartment building containing the PREMISES multiple times.**

59.     On March 5, 2021, the Honorable Judge Stephanie K. Bowman, U.S. Magistrate Judge for the Southern District of Ohio, issued search warrant No. 21-MJ-0194, which directed Verizon, the service provider for 513-280-1364, to provide intermittent GPS location information for the device with phone number 513-280-1364.

60.     On March 5, 2021, Verizon began providing GPS location information for phone number 513-280-1364.

61.     When agents first began receiving GPS location data for 513-280-1364, the data showed that the device was in Michigan. However, on March 6, 2021, the device began traveling south toward Cincinnati.

62.     From approximately 1:22 a.m. through approximately 12:36 p.m. on March 7, 2021, Verizon provided GPS location data approximately every 15 minutes showing that the device was in the approximate area of Harrison Avenue and Baker Avenue in Cincinnati. The intersection of Harrison and Baker is approximately one-tenth of a mile from the **PREMISES**.

63.     When agents established surveillance in the area of Harrison Avenue and Baker Avenue on March 7, 2021, ATF SA Remick-Cook saw a dark-blue Chevrolet Equinox bearing Florida license plate CTKZ29 (the **TARGET VEHICLE**) parked in the parking lot of an apartment complex located at 2723 Baker Avenue, Cincinnati, Ohio (the apartment building that contains the **PREMISES**). The license plate showed that the vehicle was serviced and maintained by the car rental agency Hertz.

64.     The **TARGET VEHICLE** was of particular interest to SA Remick-Cook because the vehicle matched the description of the robber's vehicle as provided by the victim from the robbery in Lebanon, as well as the description of a vehicle captured on a traffic camera near the Lebanon robbery at the relevant time; that vehicle was driving with no headlights on at night time, and it also ran a red light.

65.     Cincinnati Police Officer Hoffbauer contacted Hertz about the **TARGET VEHICLE**. Hertz provided information showing that the **TARGET VEHICLE** had been rented in the name of LAMOND JOHNSON on February 9, 2021 (the night of the second set of robberies described above).

66.　　Also on March 7, 2021, SA Remick-Cook saw an individual exit the apartment building at 2327 Baker Avenue (the building that contains the **PREMISES**) and enter the **TARGET VEHICLE**. The individual then got back out of the **TARGET VEHICLE** and reentered 2327 Baker Avenue.

67.　　Shortly thereafter, SA Remick-Cook saw the same individual come back out of 2327 Baker Avenue and approach the **TARGET VEHICLE** again. This time, SA Remick-Cook was able to identify the person as LAMOND JOHNSON, based on SA Remick-Cook's prior review of photos of JOHNSON from law enforcement databases. SA Remick-Cook watched as JOHNSON removed the license plate from the **TARGET VEHICLE** and then reentered 2327 Baker Avenue.

68.　　Shortly after that, JOHNSON exited 2327 Baker Avenue again, entered the **TARGET VEHICLE**, and drove away.

69.　　Officers and agents followed the **TARGET VEHICLE** as it drove eastbound on Harrison Avenue toward Queen City Avenue. Officers and agents then saw the **TARGET VEHICLE** at the BP Gas Station at the intersection of Harrison Avenue and Queen City Avenue. At approximately the same time, GPS information for 513-280-1364 showed that the device was also in that approximate area. As surveillance continued, sightings of JOHNSON corresponded with GPS location information for 513-280-1364 on several more occasions, which I believe shows that JOHNSON had the device with phone number 513-280-1364 on his person.

27

**K.** ███████████████████████████████████████████

70. For the reasons below, I believe ████████████████████████
████████████████████████████ that JOHNSON stayed at the **PREMISES** from approximately 1:36 a.m. on March 7, 2021, until agents saw him drive away on the afternoon of March 7, 2021.

71. As noted above, JOHNSON was previously associated with the address ████ ████████████ in Liberty Township. I queried a reliable database for information about this address and found that ██████████ was issued an Ohio driver's license listing this address on August 29, 2017.

72. As also noted above, JOHNSON was previously associated with the address ██ ████████████ Cincinnati, Ohio. Notes from JOHNSON's parole officer show that, during a parole home visit from June 2018, a person the parole officer ████████████████ ████████████████████████████ Parole notes show that during a second parole visit in August 2018, ██████████████████████████████

73. On August 13, 2018, ██████████████████████████████ ████████████████

74. I queried phone number 513-608-2051 in a database that I know to be reliable based on prior experience, and the phone number was connected ████████████ Based on

28

this information, I believe that ███████████████████████████████████

███████████████

      75.    I performed a query in a reliable database for ██████████ and found that the

**PREMISES** ████████████████████████████████████The same database

showed that ██████████ had a driver's license issued on March 3, 2020, with the

**PREMISES** as the address. These two individuals were also listed in the database as having

another shared address. Based on the common addresses and the common last name, which is

relatively unusual, I believe ███████████████████████████

      76.    ████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

      77.    ███████████████████████████████████████

███████████████████████████████

      78.    ███████████████████████████████████████

████████████████████████████████████████

██████████████████████

      79.    █████████████████████████████████████████████

███████████████

80. ████████████████████████████████████████████

████████████████████████████████

**L.** **On March 7, 2021, JOHNSON was pulled over in the TARGET VEHICLE, and he attempted to flee**.

81. On March 7, 2021, agents and officers attempted to stop JOHNSON in the

**TARGET VEHICLE.** JOHNSON and one passenger from the vehicle both attempted to flee.

Another passenger stayed in the vehicle.

82. After the other passenger was removed from the **TARGET VEHICLE**, agents

saw a cell phone in the vehicle's center console.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

83. As described above and in Attachment B, this application seeks permission to

search for records that might be found on the **PREMISES** or in the **TARGET VEHICLE**, in

whatever form they are found. One form in which the records might be found is data stored on a

computer's hard drive or other storage media. Thus, the warrant applied for would authorize the

seizure of electronic storage media or, potentially, the copying of electronically stored

information, all under Rule 41(e)(2)(B).

84. *Probable cause.* I submit that if a computer or storage medium is found on the

**PREMISES** or in the **TARGET VEHICLE**, there is probable cause to believe those records

will be stored on that computer or storage medium, for at least the following reasons:

30

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is

31

typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

85. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **PREMISES** or in the **TARGET VEHICLE** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file

32

systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity

33

associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to

34

destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

35

86. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

36

      b.   Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

      c.   Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

87.   *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

88.   Because several people appear to share the **PREMISES** as a residence, it is possible that the **PREMISES** will contain storage media that are predominantly used, and

perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## **CONCLUSION**

89.     I submit that this affidavit supports probable cause for a warrant to search the **PREMISES** described in Attachment A-1 and the **TARGET VEHICLE** described in Attachment A-2 and seize the items described in Attachment B.


Respectfully submitted,

**DEREK GRAHAM**
Digitally signed by DEREK GRAHAM
Date: 2021.03.07 19:42:55 -05

DEREK GRAHAM
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives


Subscribed and sworn to before me
on March 7, 2021 via electronic means, specifically Facetime video.

*Stephanie K. Bowman*
HON. STEPHANIE K. BOWMAN
UNITED STATES MAGISTRATE JUDGE

38

## ATTACHMENT A-1

*Property to be searched*

The property to be searched is 2723 Baker Avenue, Apt 28, Cincinnati, OH 45211 (THE PREMISES), further described as an apartment within 2723 Baker Avenue. The apartment is on the second floor. The number "28" appears on the door to the apartment.





2

**ATTACHMENT B**

*Property to be seized*

1.　　All records relating to violations of 18 U.S.C. § 1951(a) (Hobbs Act Robbery), those violations involving LAMOND JOHNSON and occurring on or about February 8 and 9, 2021 (the Target Offenses), including:

    a.　All firearms or ammunition;

    b.　All black sweatpants;

    c.　All black hooded sweatshirts;

    d.　All black gloves and white gloves;

    e.　All black shoes;

    f.　All red face masks and bandanas;

    g.　U.S. currency;

    h.　All communications and records, in whatever form they may be—whether they are paper communications such as letters, audio recordings, electronic communications, or otherwise:

        i.　Relating to robberies of convenience stores, Madeira Beverage, and/or gas stations, including plans and preparations to commit those robberies;

        ii.　Relating to the shooting of R.G. at Madeira Beverage;

   iii. Relating to the possession of a firearm or ammunition by LAMOND

     JOHNSON;

   iv. Relating to communications between LAMOND JOHNSON and any

     coconspirators to the crimes under investigation;

   v. Relating to vehicles, including rental vehicles, used by JOHNSON and/or

     coconspirators in connection with the robberies;

2. All cell phones, smart phones, tablets, and computers that could contain electronic records relating to the Target Offenses;

3. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a. evidence of who used, owned, or controlled the COMPUTER at the time the

     things described in this warrant were created, edited, or deleted, such as logs,

     registry entries, configuration files, saved usernames and passwords, documents,

     browsing history, user profiles, email, email contacts, "chat," instant messaging

     logs, photographs, and correspondence;

   b. evidence of software that would allow others to control the COMPUTER, such as

     viruses, Trojan horses, and other forms of malicious software, as well as evidence

2

of the presence or absence of security software designed to detect malicious

software;

c.   evidence of the lack of such malicious software;

d.   evidence indicating how and when the computer was accessed or used to

determine the chronological context of computer access, use, and events relating

to crime under investigation and to the computer user;

e.   evidence indicating the computer user's state of mind as it relates to the crime

under investigation;

f.   evidence of the attachment to the COMPUTER of other storage devices or similar

containers for electronic evidence;

g.   evidence of counter-forensic programs (and associated data) that are designed to

eliminate data from the COMPUTER;

h.   evidence of the times the COMPUTER was used;

i.   passwords, encryption keys, and other access devices that may be necessary to

access the COMPUTER;

j.   documentation and manuals that may be necessary to access the COMPUTER or

to conduct a forensic examination of the COMPUTER;

3

k.   records of or information about Internet Protocol addresses used by the COMPUTER;

l.   records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.   contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

4

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio ▾

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>2723 BAKER AVENUE, APT 28<br>CINCINNATI, OH 45211 | )<br>)<br>)<br>)<br>)<br>) | Case No.    1:21-MJ-196 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Southern _____ District of _____ Ohio _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1 (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____ 3/21/21 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to   Hon. Stephanie K. Bowman or Hon. Karen L. Litkovitz .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   **7:51 PM, Mar 7, 2021**

*Stephanie K. Bowman*
*Judge's signature*

City and state:   Cincinnati, Ohio

Hon. Stephanie K. Bowman, U.S. Magistrate Judge
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>1:21-MJ-196 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A-1

*Property to be searched*

The property to be searched is 2723 Baker Avenue, Apt 28, Cincinnati, OH 45211 (THE PREMISES), further described as an apartment within 2723 Baker Avenue. The apartment is on the second floor. The number "28" appears on the door to the apartment.





## **ATTACHMENT B**

*Property to be seized*

1.      All records relating to violations of 18 U.S.C. § 1951(a) (Hobbs Act Robbery), those violations involving LAMOND JOHNSON and occurring on or about February 8 and 9, 2021 (the Target Offenses), including:

      a.   All firearms or ammunition;

      b.   All black sweatpants;

      c.   All black hooded sweatshirts;

      d.   All black gloves and white gloves;

      e.   All black shoes;

      f.   All red face masks and bandanas;

      g.   U.S. currency;

      h.   All communications and records, in whatever form they may be—whether they are paper communications such as letters, audio recordings, electronic communications, or otherwise:

            i.   Relating to robberies of convenience stores, Madeira Beverage, and/or gas stations, including plans and preparations to commit those robberies;

            ii.   Relating to the shooting of R.G. at Madeira Beverage;

       iii.  Relating to the possession of a firearm or ammunition by LAMOND JOHNSON;

       iv.  Relating to communications between LAMOND JOHNSON and any coconspirators to the crimes under investigation;

       v.  Relating to vehicles, including rental vehicles, used by JOHNSON and/or coconspirators in connection with the robberies;

2.     All cell phones, smart phones, tablets, and computers that could contain electronic records relating to the Target Offenses;

3.     For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

       a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

       b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence

of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

4